**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Dorothy E. Cavallaro,                     :        Case No. 1:14CV1057
                                          :
        Plaintiff,                        :
                                          :
vs.                                       :
                                          :        **MEMORANDUM &**
Carolyn W. Colvin                         :        **ORDER**
Commissioner of Social Security           :
                                          :
        Defendant.                        :
                                          :

## I.  INTRODUCTION

Plaintiff Dorothy E. Cavallaro ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant") final determination denying her claim for Social Security Income ("SSI") under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, *et seq*., and § 405(g). The parties have consented to the Magistrate entering final judgment in this case pursuant to 28 U.S.C. § 636(c)(1) and FED. R. CRIM. P. 73 (Docket No. 15). Pending are briefs on the merits filed by both parties (Docket Nos. 17 & 19), and Plaintiff's Reply (Docket No. 20). For the reasons set forth below, the Magistrate reverses the Commissioner's decision and remands this case for further proceedings consistent with this Memorandum and Order.

## II.  PROCEDURAL BACKGROUND

On April 20, 2011, Plaintiff filed her application for SSI, alleging disability beginning March 20, 2011 (Docket No. 12, pp. 181-186 of 781). Plaintiff's claim for SSI was denied initially on July 12, 2011, and upon

reconsideration on January 31, 2012 (Docket No. 12, pp. 125-130; 135-137 of 781).  Plaintiff filed a written request for a hearing on March 12, 2012 (Docket No. 12, pp. 142-144 of 781).  On October 16, 2012, Administrative Law Judge (ALJ) Kendra S. Kleber presided over a hearing in Cleveland, Ohio, at which Plaintiff, represented by Michael Liner, and Vocational Expert (VE) Brett Salkin were present and testified (Docket No. 12, pp. 22; 52 of 781).  The ALJ issued an unfavorable decision on November 27, 2012 (Docket No. 12, pp. 19-21; 22-37 of 781).  The Appeals Council denied review of the ALJ's decision on March 20, 2014, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 781).

### III. FACTUAL BACKGROUND

**A.  ADMINISTRATIVE HEARING**

**1.  PLAINTIFF'S TESTIMONY**

Plaintiff testified that she is unemployed and last worked in a cleaning position for Turn Around Group in 2008 (Docket No. 12, pp. 66-68 of 781).  She admitted a history of marijuana, cocaine, and alcohol abuse, but stated that she no longer uses marijuana or cocaine (Docket No. 12, pp. 68-69 of 781).  Until recently, Plaintiff indicated that she consumed a bottle of vodka every weekend for approximately one year, but noted that her current consumption is down to two or three glasses of vodka once a week (Docket No. 12, pp. 68-70 of 781).

During direct examination by her attorney, Plaintiff described how she fractured her ankle in 2011, explaining that she had tripped and fallen over an umbrella she had left in the middle of her living room floor (Docket No. 12, pp. 70-71 of 781).  In response to the ALJ's questioning, Plaintiff denied having consumed alcohol prior to her fall (Docket No. 12, p. 82 of 781).  After her surgery and hospital discharge, Plaintiff was transferred for rehabilitation to Wickliffe Country Place (a nursing home), for approximately three months (Doc No. 12, p. 71 of 781).  During her stay at Wickliffe,  Plaintiff obtained a wheeled walker, which she indicated that she still uses when she leaves her house (Docket No. 12, pp. 71-72 of 781).  Plaintiff noted that she does

2

not need the walker for mobility in her home because she has plenty of things to grab for support (Docket No. 12, pp. 72, 82 of 781).

Next, Plaintiff described her ongoing physical issues, testifying that she is unable to stand longer than 10 to 15 minutes before her ankle pain requires that she sit down (Docket No. 12, p. 72 of 781).  Regardless of whether Plaintiff uses her walker, she estimated being able to walk about 10 to 15 feet before experiencing pain (Docket No. 12, pp. 72-73 of 781).  Plaintiff was last treated for her leg or ankle issues during her stay in the nursing home.  She has continued to perform her home exercises as instructed; however,  her functioning has not been completely restored (Docket No. 12, pp. 73-74 of 781).  Plaintiff also testified that a therapist came to her home after her discharged from Wickliffe; however, she was unable to recall the number of visits or advice as to continued use of her walker (Docket No. 12, pp. 83-84 of 781).  Before her fall, Plaintiff was able to walk without pain and ride her bicycle; however,  since her fall she has gained weight due to a lack of activity caused by her inability to stand or walk for long periods of time (Docket No. 12, pp. 73-74; 84 of 781).  To alleviate her pain, Plaintiff takes Ibuprofen as needed and she tries to keep pressure off her legs (Docket No. 12, pp. 74; 85 of 781).  While sitting also can cause  pain, Plaintiff stated that she can sit as long as needed (Docket No. 12, p. 74 of 781).

Plaintiff also described her problems with depression, explaining that her symptoms pre-date her fall and treatment with Mr. Stover (Docket No. 12, p. 75 of 781).  When asked why she had not obtained treatment earlier, Plaintiff explained that she had been financially unable to do so(Docket No. 12, p. 75 of 781).  Plaintiff testified that she started seeing Mr. Stover because she wanted a normal life and was tired of being depressed (Docket No. 12, p. 76 of 781).  According to Plaintiff, counseling with Mr. Stover has helped; however,  she still suffers from a lack of motivation and is unable to function (Docket No. 12, p. 76 of 781).  As to her social life, Plaintiff explained that she has one friend and does not get along very well with other people citing her

3

propensity to get into disagreements with others and frequent anger (Docket No. 12, pp. 76-77 of 781).  Plaintiff conceded, however, that she does not see other people often.  She did mention her prior workplace experiences with other people and her difficulty getting along with her younger brother (Docket No. 12, pp. 86-87 of 781).

Plaintiff described a typical day to include watching television. She has the ability to focus and concentrate on an entire television program or movie and has only occasional difficulty  concentrating and focusing when she is upset or things are unclear (Docket No. 12, pp. 78-79 of 781).  When asked about household chores, Plaintiff testified that she does her own laundry, prepares her own food, including making hamburgers and meatballs for spaghetti (Docket No. 12, pp. 79-80 of 781).  Citing her inability to stand, Plaintiff explained that she carries a chair into the kitchen to use while cooking (Docket No. 12, p. 80 of 781).  Plaintiff does grocery shopping with her brother every Saturday for about an hour and a half.  While shopping, she requires numerous breaks which may  include sitting down on her walker (Docket No. 12, pp. 80-81; 88 of 781).  Other than grocery shopping and taking a bus to Mr. Stover's office, Plaintiff testified that she does not otherwise leave her house (Docket No. 12, p. 81 of 781).  Plaintiff is able to brush her hair and teeth and bathe without the assistance of her walker (Docket No. 12, p. 82 of 781).  Plaintiff estimated that she sleeps three or four hours each night and takes sporadic naps (Docket No. 12, pp. 88-89 of 781).

## 2.    VE TESTIMONY

After determining that Plaintiff has no past work performed at the level of substantial gainful activity, the ALJ presented her first hypothetical question of the VE:

> Imagine if you would please, a hypothetical worker of the age, education, and past relevant work experience of the claimant.  To be specific, I mean a 53-year-old with a high school education and no past relevant work experience.  This person is able to perform work that involves a limited range of medium exertion, she is able to lift 50 pounds occasionally or 25 pounds frequently, able to stand or walk for six hours out of eight or just sit for six hours out of eight.  She's not – well, able only occasionally to operate foot controls with the left lower extremity, not able to climb ladders or scaffolds, only occasionally able to climb stairs or ramps.  The work the person could perform should not involve commercial driving or exposure to hazards, such as unprotected

heights or uncovered industrial machinery.  The work is furthermore limited to simple routine repetitive tasks.  The work should involve no more than occasional and superficial interaction with the public or co-workers.  Now are there jobs that such a person could perform?

(Docket No. 12, p. 93 of 781).  The VE testified affirmatively, offering the position of dishwasher, DOT [1] 318.687-010, which is unskilled work, with a specific vocational preparation (SVP)[2] of 2, requiring medium exertion, in which there are 1,000 such jobs in the five-county Cleveland economy, 5,800 in the State of Ohio, and 190,000 in the national economy; cleaner, DOT 323.687-010, which is unskilled work, with a SVP of 2, requiring medium exertion, in which there are 600 such jobs in the Cleveland Metro economy, 2,800 in the State of Ohio, and 84,000 in the national economy and; assembler, DOT 806.684-010, which is unskilled work, with a SVP of 2, requiring medium exertion, in which there are 2,900 such jobs in the Cleveland Metro economy, 19,000 in the State of Ohio, and 295,000 in the national economy (Docket No. 12, pp. 93-94 of 781).  The VE noted that these positions are a representative sample of the available positions.

Next, the ALJ added some additional limitations to her first hypothetical:

Okay, imagine if you would please, the same hypothetical worker with some additional limitations.  Additionally, the work the person could perform should involve no climbing up stairs or ramps.  The work should then -- limited to a setting with few distractions, requires a reasonably flexible schedule of work and breaks, should involve no fast pace or strict productivity expectations, the work should involve no interaction with the public, although again, no more than occasional and superficial interaction with co-workers is acceptable.  The work setting should involve no requirements for collaborative work, and should involve work where others are not dependent on her for their task completion.  Now, are there jobs such a person could perform?

(Docket No. 12, pp. 94-95 of 781).  After some confusion, the ALJ modified the distraction limitation to likely

---

[1] Dictionary of Occupational Titles ("DOT")

[2] SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

to be off-task 10 to 15 percent per day (Docket No. 12, p. 95 of 781).  The VE found the hypothetical was not consistent with competitive employment based upon his experience in the job market, explaining that being off-task for more than 10 percent is not competitive employment (Docket No. 12, pp. 96-97 of 781).

**B.  MEDICAL RECORDS**

Summaries of Plaintiff's medical records, to the extent they are necessary and relevant to the issues before this Court, follow.

**1.  HOSPITALIZATION RECORDS - EUCLID HOSPITAL/CLEVELAND CLINIC**

- On March 20, 2011, Plaintiff presented to the Emergency Department and complained of worsening left ankle pain and being unable to bear any weight on her left ankle.  The clinical impression and radiology reports reflect that Plaintiff fractured her left bimalleolar and was admitted  (Docket No. 12, pp. 421-446; 563-569 of 781).

- On March 21, 2011, Plaintiff had a consultation with Dr. Brian Donley, M.D., for her left ankle fracture and was given an ankle block with lidocaine, and an attempt was made at closing reduction and splinting, which was unsuccessful.  Plaintiff was scheduled to undergo open reduction internal fixation (ORIF) surgery on the following day.  An echocardiogram on that day revealed mild left ventricular hypertrophy, but was otherwise normal (Docket No. 12, pp. 447-449; 476-479; 515-517; 521-522 of 781).

- On March 22, 2011, Plaintiff underwent a preoperative evaluation with cardiologist  Dr. Senthil K. Thambidorai, M.D., who found Plaintiff had a mild preoperative risk for any cardiac events and Plaintiff was cleared for surgery.  Dr. Donley performed the ORIF  surgery and reported that the procedure went well and without complication (Docket No. 12, pp. 472-476; 517-520; 522; 542-543; 570 of 781).

- On March 23, 2011, Plaintiff was evaluated by Dr. Lionel J. Gottschalk IV, M.D. and he described Plaintiff as resting comfortably.  Plaintiff was given Lovenox for DVT prophylaxis, her antibiotics were to be discontinued after 24 hours, she was treated for pain control, and ordered to undergo physical therapy to increase mobility (Docket No. 12, pp. 524-525 of 781).

- On March 23, 2011, Plaintiff was evaluated by Physical Therapist (PT) Holly Fredericks for discharge recommendations. Ms. Fredericks recommended Plaintiff be discharged to an extended care facility given that Plaintiff lived alone and on the second floor, and was going to need lengthy rehabilitation (Docket No. 12, pp. 534-536 of 781).

- On March 24, 2011, Plaintiff underwent physical therapy with Tamara Duval (PT), which consisted of training Plaintiff to improve her status and safety at transferring from the sitting and

standing positions, gait training, and therapeutic exercises to address strength, motor function, and range of motion (Docket No. 12, pp. 537-538 of 781).

- On March 25, 2011, Plaintiff had physical therapy with Michelle Middleton (PTA) and continued working toward her therapeutic goals, including increased strength, status, and safety with transfers and gait (Docket No. 12, pp. 539-540 of 781).

- On March 25, 2011, Plaintiff was discharged from the hospital in stable condition to Wickliffe Country Place. Plaintiff's final diagnoses reflects that she had a closed fracture of her bimalleolar, hypothyroidism, obesity, a sprain of her distal tibiofibular, tobacco use disorder, left anterior-posterior hemiblock, and hypertension. Plaintiff's medications at discharge included Dulcolax, Colace, Lovenox, Lopressor, a multivitamin, Prilosec, Tylenol, and Mylanta (Docket No. 12, pp. 513-514 of 781).

- On April 4, 2011, Plaintiff presented for the application of a short cast to her left leg (Docket No. 12, p. 297 of 781).

- On April 4, 2011, Plaintiff had a follow up with Dr. Donley and her surgical wounds were described as looking excellent and healing very well. Dr. Donley noted that Plaintiff had a little bit of an anterior fracture blister, but that there was no evidence of infection. The record reflects that Plaintiff was staying at Wickliffe home, being medicated with Lovenox, and Dr. Donley recommended that she continue at Wickliffe while in a cast and not put any weight on her leg (Docket No. 12, pp. 295-296 of 781).

## 2. MEDICAL TREATMENT RECORDS - WICKLIFFE COUNTRY PLACE

Plaintiff was admitted to Wickliffe Country Place on March 25, 2011 for difficulty walking, muscular wasting and disuse atrophy, hypertension, and aftercare due to a traumatic ankle fracture. Plaintiff was administered Percocet for pain and zolpidem (Docket No. 12, pp. 299-305; 334 of 781).  The record also contains nursing notes from March 26, 2011 until May 11, 2011, which detail Plaintiff's mental and physical status, and complaints of pain (Docket No. 12, pp. 330-338 of 781).

### a. PHYSICAL & OCCUPATIONAL THERAPY

Between March 28, 2011 and April 26, 2011, Plaintiff underwent both physical and occupational therapy (OT) to improve her strength and safety for transferring, maintaining balance, and working with a supportive device. The records reflect that Plaintiff progressed toward her therapeutic goals during therapy, had

increased her physical and occupational capabilities, but remained a fall risk.  By April 25, 2011, the treatment records note that Plaintiff had achieved her maximum potential at that time and note that she was using a wheel chair in her unit (Docket No. 12, pp. 365-373; 377; 379-381 of 781).

### b.  DR. HARIGOPAL BALAJI

- On March 28, 2011, Dr. Balaji completed a treatment plan for Plaintiff while at Wickliffe and noted that Plaintiff had no deficit in proprioception, coordination, sensations/pain, or tone, but had a deficiency for standing and limited endurance for activities of daily living.  Dr. Balaji recommended that Plaintiff would benefit from OT services to increase her ability to safely complete activities of daily living, transfers, and activity tolerance.  Dr. Balaji indicated that Plaintiff experienced functional problems with activities such as bathing, dressing, using the restroom, and suffered from impaired balance and decreased activity tolerance.  Dr. Balaji recommended therapy interventions including therapeutic exercise and activities, self care and home management training, and neuromuscular reeducation to address balance (Docket No. 12, pp. 374-375 of 781).

- On April 4, 2011, Plaintiff was examined by Dr. Balaji who noted that Plaintiff is able to sponge bath, dress, and is tolerating therapy well.  The barriers for discharge detailed by Dr. Balaji reflect that Plaintiff was a fall risk (Docket No. 12, p. 328 of 781).

### 3.  OFFICE TREATMENT RECORDS - EUCLID INTERNAL MEDICINE - DR. WEN-AN LIN, M.D.

- On July 26, 2011, Plaintiff presented as a new patient for medication refills.  The handwritten treatment record reflects that Plaintiff's problems included hypertension, limb pain, and Tobacco Use Disorder, among other conditions.  Unfortunately, Dr. Wen-An Lin's notes concerning the medications Plaintiff was prescribed are illegible (Docket No. 12, pp. 389-390 of 781).

- On July 26, 2011, Plaintiff had an x-ray taken of her chest, which revealed possible patchy left upper lobe pneumonitis and recommended further evaluation (Docket No. 12, p. 391 of 781).  The record also includes additional laboratory and blood testing results ordered by Dr. Lin (Docket No. 12, pp. 392-397 of 781).

- On November 16, 2011, Plaintiff saw Dr. Lin for a follow up and for refills.  Dr. Lin's working diagnoses included hypercholesterolemia, hypertension, pain in limb, urinary tract infection, left ankle fracture with surgery and urinary incontinence.  Dr. Lin ordered labs for Plaintiff, a consultation with a urologist, and prescribed Plaintiff Maxzide and Lisinopril.  A radiological report from an x-ray taken showed no definite active chest disease (Docket No. 12, pp. 707-710; 717-722; 724-725 of 781).

- On July 2, 2012, Plaintiff presented for a check up and refills.  The treatment record also notes that Plaintiff needed labs for thyroid and was feeling fatigued.  Dr. Lin's working diagnoses included hypercholesterolemia, hypertension, malaise and fatigue, pain in limb, and sleep apnea.

8

Dr. Lin prescribed Maxzide and Metoprolol medications (Docket No. 12, pp. 705-706; 712-716; 723 of 781).

- On August 1, 2012, Plaintiff saw Dr. Lin for a follow up and reported being fatigued and having decreased energy.  The handwritten treatment record lists Plaintiff's working diagnoses as general symptoms, hypercholesterolemia, hypertension, hypothyroidism, and sleep apnea.  Dr. Lin ordered Plaintiff to undergo lab testing and an ultrasound of her abdomen and gall bladder (Docket No. 12, pp. 703-704 of 781).

### 4.    HUMANISTIC COUNSELING CENTER - JAMES A. STOVER, M.ED., L.P.C.

#### a.    OFFICE TREATMENT RECORDS

The record reflects that between August 18, 2011 and October 9, 2012, Plaintiff attended therapy with Mr. Stover on 35 occasions.  Mr. Stover's notes detailing the therapy sessions reflect that Plaintiff was having difficulties with personal hygiene and grooming, angry outbursts, organization, memory, depression and anxiety. Plaintiff frequently reported having interpersonal conflicts, experiencing low self-esteem, social isolation, sadness, and bilateral knee and left ankle pain (Docket No. 12, pp. 747-781 of 781).  Plaintiff first complained to Mr. Stover about her bilateral knee and left ankle pain on August 30, 2011, and on ten occasions thereafter, including most recently on October 2, 2012 (Docket No. 12, pp. 749; 752; 755; 757; 762; 766; 772; 775; 777-778; 780 of 781).

#### b.    STATE AGENCY QUESTIONNAIRE

A questionnaire dated December 27, 2011 and completed by Mr. Stover indicates that Plaintiff had undergone 18 outpatient counseling/therapy sessions at that time.   Mr. Stover opined that Plaintiff displays a low frustration tolerance, experiences difficulty recalling dates, appointments, organizing important documents, and has episodes of rage when a situation is not to her liking.  Mr. Stover indicated that Plaintiff has significant restrictions of daily activities, including an inability to pay bills, track information/paperwork, and that Plaintiff reported angry outbursts, depression, and anxiety.  Regarding the effect of Plaintiff's impairments on her interests, Mr. Stover summarized Plaintiff's reports of spending most of her time watching television, being

alone, infrequently bathing, and difficulties trusting others and maintaining friendships.  Mr. Stover detailed Plaintiff's reports of being terminated from approximately seven employment positions due to interpersonal conflicts with co-workers and supervisors that Plaintiff felt were against her.  Citing Plaintiff's reports, Mr. Stover indicated that Plaintiff's depression and anxiety symptoms date back to when she was age six and have persisted through adulthood.  According to Mr. Stover, Plaintiff's economic hardship has prevented her from being able to afford treatment to address her anxiety and depression symptoms while also noting that she is forgetful when it comes to taking medication and maintaining appointments.  Finally, Mr. Stover opined that Plaintiff's ability to tolerate stress would be low given his observations of her anger, that she would require assistance if she were awarded funds, and that his diagnosis included Dysthymic Disorder, with a secondary diagnosis of Anxiety Disorder, not otherwise specified.  Mr. Stover also included his rationale for both of his diagnoses in his questionnaire (Docket No. 12, pp. 406-410 of 781).

**b.      Mental Impairment Questionnaire**

On September 13, 2012, Mr. Stover completed a mental impairment questionnaire, describing his treatment relationship as consisting of once a week sessions, which lasted between 60 and 75 minutes.  Mr. Stover opined that Plaintiff has Dysthymic Disorder, problems with her primary support group, difficulties socializing, and he assessed Plaintiff a GAF score at 46.  Mr. Stover noted that he has observed Plaintiff display symptoms of anxiety and having difficulty with memory and organization.  Mr. Stover's prognosis included Dysthymic Disorder based upon her subjective reports of symptoms with a secondary diagnosis of Anxiety Disorder NOS, which was also based upon her reported symptoms.  In regards to Plaintiff's functional limitations, Mr. Stover opined that Plaintiff has no limitations for asking simple questions or asking for help, traveling in unfamiliar places, and using public transportation.  Mr. Stover assessed Plaintiff mild limitations in sustaining an ordinary routine without special supervision, and being aware of normal hazards and taking precautions.  He noted that Plaintiff has serious limitations in understanding, remembering, and carrying out very

10

short and simple instructions. Mr. Stover found Plaintiff unable or markedly limited in remembering work-like procedures, maintaining attention for two-hour segments, working in coordination with or proximity to others without being unduly distracting, completing a normal workday and workweek without interruptions from psychologically based symptoms, and in interacting appropriately with the general public. Lastly, Mr. Stover opined that Plaintiff is extremely limited in maintaining regular attendance and being punctual within customary, usually strict tolerances, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting extremes, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, dealing with stress of semiskilled and skilled work, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness. Mr. Stover did not, however, include any explanation, medical or clinical findings for his opinions concerning Plaintiff's limitations.

According to Mr. Stover, Plaintiff's psychiatric condition exacerbates Plaintiff's pain or physical symptoms, and that her depression limits her participation in several daily activities, including maintaining personal hygiene. Mr. Stover opined that even a minimal increase in mental demands or change in Plaintiff's environment would likely cause her to decompensate. Mr. Stover noted that based upon Plaintiff's impairments or treatments, he believed she would miss more than four days of work per month. Mr. Stover also indicated that Plaintiff's impairments do not include substance abuse and that Plaintiff would be unable to manage benefits in her own best interest if they were awarded (Docket No. 12, pp. 734-743 of 781).

### 5.    OFFICE TREATMENT RECORDS - DR. LAWRENCE MARTIN, M.D.

On July 9, 2012, Plaintiff had a consultation with Dr. Martin for evaluation concerning her pulmonary and sleep issues. Dr. Martin found that Plaintiff has obstructive sleep apnea and scheduled her for a night sleep study (Docket No. 12, pp. 711; 726 of 781). Plaintiff participated in the split night sleep study on August 3,

2012.  The results of the sleep study note that Plaintiff has severe obstructive sleep apnea before CPAP.  Dr. Martin recommended that Plaintiff use an auto-titration machine with a pressure range of 4 to 20 cm H2O, and heated humidity for comfort (Docket No. 12, pp. 727-733 of 781).

### 6.    OFFICE TREATMENT RECORDS - SIGNATURE HEALTH - KAREN SZENTKERESTI, M.A. P.C.

On September 28, 2012, Plaintiff presented for a diagnostic assessment reporting depression and anxiety. Plaintiff was described as alert and oriented, with appropriate mood, normal affect, and normal speech tone, volume, articulation, and use of language.  Ms. Szentkeresti indicated that Plaintiff was cooperative and friendly, her perceptions without impairment, having logical and intact thought processes and thought content.  Plaintiff reported consuming alcohol on the weekends, and denied hallucinations, homicidal or suicidal thoughts. Plaintiff also denied having any phobias, obsessions, compulsions, preoccupations, delusions, or magical thinking.  Ms Szentkeresi noted that Plaintiff's motor activity was coordinated, that Plaintiff appeared reliable, her immediate recall and recall of recent events were both fair, but her recall of remote events was poor. Plaintiff's judgment and insight were also assessed as fair.  Ms. Szentkeresti's diagnoses for Plaintiff included Depressive Disorder NOS, Anxiety Disorder NOS, Alcohol dependence, and assessed her a GAF score of 50 (Docket No. 12, pp. 744-746 of 781).

### C.    CONSULTATIVE EXAMINATIONS

### 1.    PSYCHOLOGICAL CONSULTATIVE EXAMINATION - RICHARD C. HALAS, M.A.

On November 9, 2011, Plaintiff underwent a consultative examination, including a clinical interview and mental status examination.  Plaintiff reported being divorced and living with her brother, and being a high school graduate.  Plaintiff indicated having been twice convicted of DUI, suffering from substance abuse issues including past marijuana and crack cocaine use, and most recently alcohol and tobacco use.  Plaintiff described her physical health as poor and recent hospitalization after fracturing her left ankle.  She reported her current medications as Lisinopril, Metoprolol, Potassium, and Hydrochlorothiazide.  With respect to her psychiatric

history, Plaintiff noted that she sees James Stover for depression. At the time of the examination, Plaintiff reported being unemployed and past employment at temporary employment agencies and as a machine operator for Obis. The results of Mr. Halas' mental status examination concluded that Plaintiff has average cognitive capabilities, a history of substance abuse, and is an overeater. His diagnoses of Plaintiff included a primary diagnosis of Major Depression, recurrent type, Polysubstance Abuse, and a secondary diagnosis of Borderline Personality Disorder with dependent traits. Plaintiff was assessed a global assessment of functioning score of 45 for serious symptoms. Mr. Halas' functional assessment of Plaintiff opined that she had no limitations in understanding, remembering, and carrying out instructions; slight limitations in maintaining attention, concentration, persistence and pace for performing simple and multi-step tasks; significant limitations in responding appropriately to supervision and to co-workers in a work setting and; no limitations in responding appropriately to work pressures in a work setting. Mr. Halas also concluded that Plaintiff would be unable to manage funds appropriately if her claim were granted (Docket No. 12, pp. 398-402 of 781).

## 2. PHYSICAL CONSULTATIVE EXAMINATION - DR. WILFREDO M. PARAS, M.D.

On January 10, 2012, Plaintiff arrived at her consultative examination by bus. Plaintiff reported suffering from bilateral knee pain since age five, which has become progressively worse over the last ten years and has not been evaluated by a doctor. Plaintiff indicated that she has constant right knee pain associated with swelling, but has not had any x-rays taken of her knees and does not take pain medicine. Plaintiff also reported having hypertension last year and being placed on medication, which she took until the medication ran out about a month ago, and that she underwent surgery for a shattered left ankle in March 2011. Plaintiff complained that she experiences pain in her left ankle, especially during cold and rainy weather or with prolonged walking or standing. Dr. Paras' notes reflect that Plaintiff also suffers from obesity. On examination, Dr. Paras found Plaintiff walked slowly with a waddling gait, a soft, morbidly obese abdomen, reduced distal pulses in both legs, and reduced bilateral deep tendon reflexes. During manual muscle and range of motion testing, Dr. Paras found

13

Plaintiff had stiffness in her lower back, limited range of motion of her dorsolumbar spine, limited flexion of both hips, stiffness in the right knee, limited flexion of the right knee, and stiffness of the ankles during full range of motion tests. Dr. Paras noted that an x-ray of Plaintiff's right knee revealed mild degenerative changes. Dr. Paras' medical impressions noted bilateral knee pain, hypertension, morbid obesity, history of left ankle fracture, and mental disorder including depression. Based on the record, the ALJ opined that Plaintiff's general work limitation is for light work (Docket No. 12, pp. 414-420 of 781).

## D.  STATE AGENCY DETERMINATIONS

### 1.  DR. WILLIAM BOLZ, M.D.

During the Agency's initial consideration of Plaintiff's disability claim, Dr. Bolz reviewed Plaintiff's case on behalf of the Agency. Dr. Bolz determined that only Plaintiff's left ankle fracture was a severe impairment, but was not severe enough as to have precluded Plaintiff from engaging in substantial gainful employment (Docket No. 12, p. 102 of 781). Dr. Bolz did not render either a physical or mental residual functional capacity (RFC) in Plaintiff's case (Docket No. 12, p. 103 of 781).

### 2.  DR. JANET SOUDER, PSY.D.

Upon reconsideration of Plaintiff's disability claim, Dr. Souder reviewed the psychological aspects of Plaintiff's case, rendering psychiatric review technique (PRT) findings on November 15, 2011. Dr. Souder considered Plaintiff's case under the criteria set forth in listings 12.04 Affective Disorders, 12.08 Personality Disorders, and 12.09 Substance Addiction Disorders. Out of the three listings, Dr. Souder only found evidence to satisfy the paragraph 'A' criteria under listing 12.04, noting that there was no evidence that precisely satisfied the diagnostic criteria for listings 12.08 and 12.09. With respect to the 'B' criteria of the listings, Dr. Souder found Plaintiff had a moderate restriction in both activities of daily living and in maintaining social functioning, a mild limitation in maintaining concentration, persistence or pace, and no evidence of repeated episodes of decompensation. Dr. Souder also found no evidence to establish the presence of any of the 'C' criteria under

any of the three listings (Docket No. 12, pp. 115-116 of 781).

Dr. Souder also rendered a mental RFC for Plaintiff opining that she is moderately limited in working in coordination with or in proximity to others without being distracting by them, her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods. In regards to social limitations, Dr. Souder assessed Plaintiff marked limitations in interacting appropriately with the general public, moderate limitations in her abilities to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. Dr. Souder further opined that Plaintiff is moderately limited in responding appropriately to changes in the work setting (Docket No. 12, pp. 119- 121 of 781).

### 3.    DR. ELAINE M. LEWIS, M.D.

On January 27, 2012, Dr. Lewis reviewed the physical aspects of Plaintiff's case as part of the Agency's reconsideration of Plaintiff's disability claim and rendered her physical RFC assessment. Dr. Lewis opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and sit and stand about six hours during an eight-hour workday. Dr. Lewis also noted that Plaintiff is limited in pushing and pulling in her lower extremities. According to Dr. Lewis, Plaintiff is able to frequently climb ramps/stairs, stoop, kneel, crouch, and crawl, but can never climb ladders/ropes/scaffolds, and has unlimited balance. With respect to environmental limitations, Dr. Lewis opined that Plaintiff should avoid even moderate exposure to hazards including machinery and heights (Docket No. 12, pp. 118-119 of 781). Dr. Lewis ultimately concluded, based upon the case record, that Plaintiff was not disabled (Docket No. 12, p. 123 of 781).

**E.      OTHER EVIDENCE**

The record also includes other evidence, including a third-party statement from Ms. Ozbolt, Plaintiff's friend of over forty years (Docket No. 12, pp. 264-271 of 781).

## IV. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923). At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014). If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West

2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014). While the claimant has the burden of proof in steps one through four, the Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

## V. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Kleber made the following findings:

1.  Plaintiff has not engaged in substantial gainful activity since April 7, 2011, the application date.

2.  Plaintiff has the following severe impairments: obesity, mild degenerative joint disease of the right knee, residual effects of a left ankle fracture, alcohol abuse, anxiety disorder, and dysthymic disorder.

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, ALJ Kleber found that Plaintiff has the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. § 416.967(c), with restrictions.  Specifically, she can lift and carry up to 50 pounds occasionally and 25 pounds frequently.  In an eight-hour workday, she can stand or walk for six hours and sit for six hours.

She can occasionally climb ramps and stairs, but cannot climb ladders, ropes or scaffolds.  She cannot perform commercial driving due to the restriction on foot controls.  She cannot work in proximity to unprotected heights or uncovered industrial machinery.  She is limited to simple, routine, repetitive tasks with easily explainable changes.  She is limited to no more than occasional and superficial interaction with the public or co-workers.

5.  Plaintiff has no past relevant work.

6.  Plaintiff was born on May 4, 1957 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date Plaintiff filed the application.  Plaintiff subsequently changed age category to advanced age.

7.  Plaintiff has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

9.  Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.  Plaintiff has not been under a disability, as defined in the Social Security Act, since April 7, 2011, the date Plaintiff filed the application.

(Docket No. 12, pp. 22-37 of 452).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (*quoting* 42 U.S.C. § 405(g)).  "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance."

18

*Miller*, (*quoting Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (*quoting Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence and alleges that the ALJ erred by: (1) rendering a RFC assessment that is not supported by substantial evidence and (2) improperly evaluating Plaintiff's impairments at step-three of the five-step sequential analysis for evaluating a disability claim (Docket Nos. 17 & 20).

### B.    DEFENDANT'S ALLEGATIONS

Defendant disagrees with Plaintiff's assignments of error and argues that the ALJ's assessment of Plaintiff's RFC and the medical source opinions is supported by substantial evidence.  Defendant also argues that Plaintiff has failed to meet her burden at step-three that she has a condition that meets or medically equals a listed impairment (Docket No. 19).

### C.    ANALYSIS

#### 1.    WHETHER THE ALJ'S RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff argues that the ALJ's RFC determination that she is capable of performing medium work is not supported by substantial evidence because the determination is not supported by a medical opinion included in the record (Docket No. 17, pp. 18-19 of 24).  Relying on *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908,

911-12 (N.D. Ohio 2008) and *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 at *2 (N.D. Ohio), Plaintiff

contends that the ALJ improperly based Plaintiff's RFC on the ALJ's own interpretation of the raw medical data

(Docket No. 17, pp. 18-21 of 24; Docket No. 20).  Plaintiff also challenges the weight the ALJ assessed the

residual capacity opinions rendered by Dr. Paras and Dr. Lewis (Docket No. 17, pp. 19-21 of 24; Docket No.

20).  Defendant disagrees with Plaintiff's reliance on *Deskin* and asserts that it is the ALJ, not a doctor, who is

responsible for making a claimant's RFC determination, arguing that the ALJ is not bound by medical source

RFC opinions (Docket No. 19, p. 9 of 12).

      As an initial matter, the Court finds Plaintiff's reliance on *Deskin* is misplaced.  In *Deskin,* the district

court addressed the question of when an ALJ should make a determination as to a claimant's functional capacity

in the absence of a medical opinion from the claimant's treating physician, a consulting examiner or medical

expert.  *Deskin*, 605 F.Supp.2d at 910-11.  It was within this context that the district court emphasized the

importance of residual capacity opinions offered by medical sources, observing that an "ALJ may not interpret

raw medical data in functional terms."  *Id.* at 914-15.  The court went on to hold that  "[a]s a general rule, where

the transcript contains *only diagnostic evidence and no opinion from a medical source about functional

limitations* (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete

record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert

testify at the hearing. . . . [unless] the medical evidence shows 'relatively little physical impairment' and an ALJ

'can render a commonsense judgment about functional capacity.'" *Id.* at 912 (emphasis added).  The facts of this

case are clearly different from those presented in *Deskin*.  In this case, Plaintiff's case record includes residual

capacity opinions from both a consultative examiner and the Agency's medical consultant in addition to

diagnostic evidence.  More importantly, however, is not that the ALJ's RFC findings are based on a supporting

medical source opinion, but rather whether the RFC is based upon all of the relevant evidence in the claimant's

case record. *See* 20 C.F.R. § 416.945(a)(1) (West 2015).

A claimant's RFC is the "most [the claimant] can still do despite [his or her] limitations. 20 C.F.R. § 416.945(a)(1) (West 2015). The RFC is an "assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996)(West 2015). At the administrative hearing level, the ALJ is tasked with the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 416.946(c) (West 2015). Federal regulations require that the claimant's RFC be "based on all of the relevant evidence in the claimant's case record." 20 C.F.R. § 416.945(a)(1) (West 2015). This relevant evidence includes the claimant's medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations. *See* 20 C.F.R. §§ 416.945(a)(3), 416.929 (West 2015); SSR 96-8p, 1996 WL 374184 at *5 (West 2015). This evidence includes opinions offered from both medical and non-medical sources, which must be weighed in accordance with Agency rules and regulations. *See* 20 C.F.R. § 416.913 (West 2015).

In challenging the ALJ's RFC, Plaintiff alleges that the ALJ erred in weighing the residual capacity opinions rendered by Dr. Paras and Dr. Lewis (Docket No. 17, p 19 of 24; Docket No. 20). After conducting a consultative examination of Plaintiff, Dr. Paras opined that Plaintiff's general work limitation is for light work (Docket No. 12, p. 415 of 781). Dr. Lewis reviewed Plaintiff's case on behalf of the Agency and similarly found Plaintiff capable of a limited range of light work (Docket No. 12, pp. 117-119;121-122 of 781). The ALJ's decision, however, assessed Plaintiff a RFC for medium work (Docket No. 12, p. 27 of 781). The only difference between the definitions provided in the regulations for medium and light work is with respect to the amount of weight the person is expected to be able to lift and carry. *See* 20 C.F.R. §§ 416.967(b), (c) (West 2015)(defining medium work to include lifting no more than 50 pounds and lifting or carrying up to 25 pounds whereas light work involves lifting no more than 20 pounds and lifting or carrying up to 10 pounds). Since no

21

medical source opinion found Plaintiff capable of medium work, Plaintiff reasoned that the ALJ's RFC was based on her own interpretation of the raw medical data (Docket No. 17, p. 20 of 24; Docket No. 20). Although the ALJ is not bound by the findings rendered by an Agency consultant or program physician, the regulations specify that these individuals are "highly qualified . . . medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i) (West 2015). The regulations require an ALJ to consider and evaluate such findings using relevant factors including the medical specialty and expertise of the source, and the support provided for the opinion. *See* 20 C.F.R. § 416.927(e)(2)(ii) (West 2015).

In her analysis of the opinion evidence, the ALJ noted giving Dr. Paras' opinions less weight, reasoning that his limitation of Plaintiff to light work was unexplained and unsupported by his clinical findings, and that he had failed to assess postural and environmental limitations which are supported by the evidence (Docket No. 12, p. 32 of 781). Citing Dr. Paras' findings from his physical examination, manual muscle testing, and an x-ray of Plaintiff's knees, Plaintiff argues that the ALJ's rationale for the weight she assessed Dr. Paras is contrary to the record (Docket No. 17, p. 20 of 24). Defendant contends, however, that the ALJ appropriately discounted Dr. Paras findings because he failed to provide an explanation for how Plaintiff's limitations caused by knee pain, obesity and her left ankle fracture limit her to the weight restrictions for light work (Docket No. 19, pp. 9-10 of 12).

The ALJ similarly discounted Dr. Lewis' opinions, noting that she gave them some weight, but found "the evidence as a whole, including the evidence regarding obesity indicates greater capacity exertionally but greater limitations in climbing ramps or stairs" (Docket No. 12, p. 32 of 781). Plaintiff argues that the ALJ's reasoning is vague, insufficient, and does not support the ALJ's finding that Plaintiff is capable of medium work (Docket No. 17, pp. 20-21 of 24; Docket No. 20, p. 4 of 6). Defendant disagrees and argues that the ALJ patterned her RFC after Dr. Lewis' findings and only differs in respect to the weight that Plaintiff is capable of lifting and carrying (Docket No. 19, p. 10 of 12). Defendant also contends that the ALJ's conclusion that

22

Plaintiff is capable of lifting and carrying is reasonable given that Plaintiff's impairments primarily affect her lower extremities (Docket No. 19, p. 10 of 12).

After reviewing the record and pleadings in this case, the undersigned Magistrate finds that the ALJ's analysis concerning the opinions of Dr. Paras and Dr. Lewis are not supported by substantial evidence for several reasons.  Significantly, the ALJ's decision does not reflect her consideration of all of the relevant factors as described in 20 C.F.R. § 416.927(e)(2)(ii), including most notably, the consistency between the opinions of both Dr. Paras and Dr. Lewis, which found Plaintiff limited to light work.  Social Security rules specifically note:

> [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as . . . supportability of the opinion in the evidence . . . the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.

SSR 96-6p, 1996 WL 374189 at *2 (July 2, 1996)(West 2015).  Clearly the consistency between Agency's two medical sources, who are described by regulations as experts in Social Security disability evaluation, is relevant to this case. *See* 20 C.F.R. § 416.927(e)(2)(i) (West 2015).

The ALJ's rationale for giving less weight to Dr. Paras' limitation of Plaintiff to light work is also problematic because the ALJ's explanation is inaccurate.  Dr. Paras' two-page, typed report detailing his consultative examination of Plaintiff notes, in relevant part, that Plaintiff walked slowly with a waddling gait, had reduced tendon reflexes, limited flexion in her right knee and hips, stiffness in her lower back, right knee, and ankles, limited range of motion in her dorsolumbar spine, and that an x-ray revealed mild degenerative changes of the right knee (Docket No. 12, p. 415 of 781).  After detailing his findings and medical impressions, Dr. Paras summarized his report, citing Plaintiff's complaint of bilateral knee pain, her morbid obesity, stiffness in her left ankle, and depression, concluding that her general work limitation was for light work (Docket No. 12, p. 415 of 781).  Clearly and contrary to the ALJ's assertion, Dr. Paras has provided both an explanation and

23

offered clinical findings in support of his limitation.

The ALJ's rationale for the weight attributed to Dr. Lewis' opinion is also inadequate. While the ALJ gave some weight to Dr. Lewis' opinion, she found the evidence as a whole, including the evidence of Plaintiff's obesity was indicative of a greater exertional capacity (Docket No. 12, p. 32 of 781). The ALJ did not, however, provide any indication concerning which evidence she was referring to or how such evidence was indicative of Plaintiff having a greater exertional capacity than for light work. While the ALJ's reference to the evidence of Plaintiff's obesity is less ambiguous given her discussion of SSR 02-1p, the ALJ fails to support her conclusion that living independently, performing household chores, cooking, and shopping are consistent with medium work given the record contains no evidence, objective or subjective, that Plaintiff is capable of lifting 50 pounds or frequently lifting or carrying up to 25 pounds (Docket No. 12, p. 30 of 781). In summary, there is no evidence that Plaintiff is capable of more than light work.

For these reasons, the undersigned Magistrate finds the ALJ's RFC findings unsupported by substantial evidence.

## 2.  WHETHER THE ALJ'S STEP-THREE FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

Next, Plaintiff alleges that the ALJ erred at step-three of her analysis by failing to conduct a meaningful review of the medical evidence concerning her left ankle reconstruction under Listings 1.02A and 1.03 (Docket No. 17, p. 21 of 24). Defendant maintains that the ALJ's findings are supported by substantial evidence and argues that the Plaintiff has not met her burden of showing that she meets or medically equals a listed impairment (Docket No. 19, pp. 6-7 of 12). Defendant also contends that there is no evidence that shows Plaintiff meets the criteria of Listings 1.02A and 1.03 (Docket No. 19, p. 7 of 12).

Among the ALJ's findings at step-two, she determined Plaintiff's residual effects from her left ankle fracture to be a severe impairment (Docket No. 12, p. 24 of 781). The ALJ's identification of severe impairments at step-two are relevant throughout the remainder of the ALJ's analysis, including at step-three in

comparing the claimant's impairments to the list of disorders set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See McClellan v. Astrue*, 804 F.Supp.2d 678, 690 (E.D. Tenn. 2011); 20 C.F.R. § 416.925 (West 2015). It is up to the claimant to demonstrate that he or she suffers from a listed impairment or its medical equivalent, regardless of his or her age, education or work experience. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)(citations omitted).  It is up to the adjudicator to determine whether a claimant has met his or her burden as described in SSR 96-6p:

> The [ALJ] or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled.  As the trier of the facts, an [ALJ] or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments.  However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p, 1996 WL 374180 at *3 (July 2, 1996)(West 2015); *Moran v. Comm'r of Soc. Sec.*, 2014 WL 4197366 at *25 (E.D. Mich. 2014)(slip opinion).  "The basic principle behind SSR 96-6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings, expert assistance is crucial to the ALJ's determination of whether a claimant's ailments are *equivalent to* the Listings." *Moran*, 2014 WL 4197366 at *27 n.10 (*quoting Galloway v. Astrue*, 2008 WL 8053508, at *5 (S.D. Tex. 2008)(citing *Frank v. Barnhart*, 455 F.Supp.2d 554, 558 n.3 (E.D. Tex. 2006)(emphasis in original).  The ALJ is unable, however, to make an equivalency determination under the listings without a supporting medical expert opinion from a physician designated by the Commissioner. *See* SSR 96-6p, 1996 WL 374180 at *3-4; 20 C.F.R. § 416.1016 (West 2015).

Here, during both the initial and reconsideration stages of the administrative review process, Plaintiff's left ankle fracture was considered under the criteria for Listing 1.06  (Docket No. 12, pp. 102; 116 of 781).  The regulations require for Listing 1.06:

1.06 Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With:

A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.06 (West 2015).  After reviewing the medical record, neither of the

Agency's medical experts found Plaintiff's impairments were of a severity to preclude her from engaging in

substantial gainful activity within 12 months of her onset date (Docket No. 12, pp. 102; 116 of 781).  Plaintiff

alleges the ALJ erred by failing to provide some analysis concerning Plaintiff's ability to ambulate in relation

to the criteria of Listings 1.02A and 1.03 for her history of left ankle fracture (Docket No. 17, p. 22 of 24).

Plaintiff does not, however, cite any evidence which would satisfy the criteria of either Listing 1.02A or 1.03.

The language of Listings 1.02A and 1.03 provide:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation or motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
. . .

1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.02, 1.03 (West 2015).  The regulations define effective ambulation:

b. What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has

the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at § 1.00B2b.  After reviewing the record and the criteria of the listings, the undersigned finds  no evidence to support the criteria under either Listing 1.02A or 1.03 or that Plaintiff is unable to ambulate effectively. Plaintiff fails to cite any evidence which demonstrates otherwise and thus has failed to meet her burden at step-three.

Therefore, the undersigned Magistrate finds the ALJ's step-three findings supported by substantial evidence.

## VIII. CONCLUSION

For the foregoing reasons, the undersigned Magistrate reverses the Commissioner's decision and remands this case, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Order.  On remand, the Commissioner should re-assess Plaintiff's RFC for light work as supported by the evidence and if appropriate re-evaluate the disability determination.

**IT IS SO ORDERED**

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: January 28, 2015

27